JUDGE STEIN

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
                                    :
UNITED STATES OF AMERICA            :
                                    :     07CRM1202
        - v. -                      :
                                    :     07 Cr.
DOMINICK R. MAIORANO,               :
                                    :
        Defendant.                  :
                                    :
- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/19/2007

### COUNT ONE

(Conspiracy to Commit Securities Fraud and Commercial Bribery)

The United States Attorney charges:

**RELEVANT PERSONS AND ENTITIES**

1.  At all times relevant to this Information, Biofarm, Inc. ("Biofarm") was a Nevada corporation. Biofarm was a so-called "shell" corporation, with no operating business. Biofarm's common stock was publicly-traded under the ticker symbol "BIOF" on the Over-The-Counter Bulletin Board (the "OTC Bulletin Board")- an electronic quotation service regulated by the National Association of Securities Dealers (the "NASD") that displays electronically throughout the United States real-time quotes, last-sale prices, and volume information in certain equity securities.

2.  At all times relevant to this Information, National Securities ("National") was a securities broker-dealer that was registered with the Securities and Exchange Commission

(the "SEC") and a member of the NASD. National maintained its headquarters in Seattle, Washington and operated a branch office in New York, New York. Among its other businesses, National offered securities brokerage services to retail customers throughout the United States.

3. According to documents filed with the SEC, at all times relevant to this Information, a co-conspirator not named herein ("CC-1"): (a) was the Chief Financial Officer, Vice President, and Director of Biofarm; (b) was also involved in the management of several family businesses; and (c) owned at least approximately 200,000 shares of Biofarm common stock.

4. CC-2 was, at all times relevant to this Information, a co-conspirator not charged as a defendant in this Information.

5. CC-3 was, at all times relevant to this Information, a co-conspirator not charged as a defendant in this Information.

6. CC-4 was, at certain times relevant to this Information, a co-conspirator not charged as a defendant in this Information.

7. At all times relevant to this Information, DOMINICK R. MAIORANO, the defendant, was a securities broker and a registered representative licensed by the NASD. From at least in or about May 2003 through in or about January 2004, MAIORANO

was employed as a securities broker at one and more National branch offices in New York, New York and Hauppauge, New York.

### THE SCHEME TO DEFRAUD

8. From in or about the summer of 2003 up to and including in or about April 2006, DOMINICK R. MAIORANO, the defendant, CC-1 and their co-conspirators engaged in a fraudulent scheme to raise artificially the price and demand for Biofarm common stock through the payment of secret bribes to MAIORANO to induce MAIORANO and others to purchase Biofarm common stock.

9. In or about the summer of 2003, CC-1 told CC-2 that Biofarm was attempting to conclude a business transaction that would raise significant sums of money for Biofarm, but that the investors would not provide the funds if the price of Biofarm's stock was less than approximately $1.00 per share. (At the time, Biofarm's stock generally was trading in a range of between approximately $0.60 and $0.70 per share.) CC-1 asked CC-2 whether CC-2 could help raise the price of Biofarm's common stock to approximately $1.00 or more per share. CC-2 approached DOMINICK R. MAIORANO, the defendant, and asked whether he would be willing to assist with CC-1's plan. MAIORANO told CC-2 that he could and would assist with the scheme to increase the price of Biofarm's common stock by generating purchases of the stock in the market. MAIORANO and CC-2 agreed that MAIORANO would be paid for his efforts through transfers of shares of Biofarm common

3

stock into accounts designated by MAIORANO in an amount equal to approximately 20 percent of the volume of shares purchased as a result of MAIORANO's efforts. CC-1 informed CC-2, who served as the "middle man" between CC-1 and MAIORANO, that CC-1 was willing to pay the 20 percent secret bribe to MAIORANO.

10. From in or about August 2003, through in or about November 2003, pursuant to his agreement with CC-1 and CC-2, to inflate artificially the price of Biofarm common stock, DOMINICK R. MAIORANO, the defendant, executed open-market purchases of Biofarm's common stock on behalf of retail customers of National, including accounts in the name of CC-3, who agreed to participate in the scheme and share the proceeds of the secret bribes with MAIORANO. Such trading resulted in an artificial increase in the price of Biofarm common stock from approximately $0.60 to approximately $1.09 per share during the approximately three-month period between on or about August 8, 2003 and on or about November 3, 2003.

11. During the period in which DOMINICK R. MAIORANO, the defendant, was artificially pumping up the price of Biofarm's common stock, MAIORANO gave instructions to CC-2 about the account into which CC-1 should transfer the shares MAIORANO was owed for his efforts (the "CC-3 Account"). CC-2, in turn, conveyed that information to CC-1. On approximately four occasions between in or about August 2003 and in or about

November 2003, CC-1 instructed a brokerage firm to transfer a total of 55,000 shares of Biofarm common stock held in accounts owned by family businesses in which CC-1 served as an officer (the "CC-1 Accounts") to the CC-3 Account.

12. DOMINICK R. MAIORANO, the defendant, told CC-2 that he was responsible for generating purchases totaling approximately 500,000 shares of Biofarm common stock, and that therefore he was owed a total of approximately 100,000 shares, or approximately 45,000 more shares than MAIORANO had then received. During the period between in or about July 2004 and April 2006, CC-2 had numerous separate conversations with CC-1 and MAIORANO, during which he attempted to facilitate the payment of the additional 45,000 shares that MAIORANO claimed to be owed.

## THE CONSPIRACY

13. From in or about the summer of 2003 up to and including in or about April 2006, in the Southern District of New York and elsewhere, DOMINICK R. MAIORANO, the defendant, together with one and more co-conspirators not named as a defendant in this Information, and others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, to commit: (a) securities fraud, in violation of Sections 78j(b) and 78ff of Title 15, United States Code, and Section 240.10b-5 of Title 17, Code of Federal

Regulations; and (b) commercial bribery, in violation of the laws of the State of New York, by using the facilities of interstate commerce, in violation of Section 1952(a)(3) of Title 18, United States Code.

## OBJECTS OF THE CONSPIRACY

### Securities Fraud

14.  It was a part and object of the conspiracy that DOMINICK R. MAIORANO, the defendant, together with one and more co-conspirators not named as defendants in this Information, and others known and unknown, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce, the mails, and the facilities of national securities exchanges, directly and indirectly, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon a person, in connection with the purchase and sale of

Biofarm common stock, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

### Travel Act: Commercial Bribery

15. It was further a part and object of the conspiracy that DOMINICK R. MAIORANO, the defendant, together with one and more co-conspirators not named as defendants herein, and others known and unknown, unlawfully, willfully, and knowingly, would and did travel in interstate and foreign commerce and use the mails and facilities in interstate and foreign commerce, with intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity, specifically (a) commercial bribery, in violation of New York State Penal Law Sections 180.00 and 180.03; and (b) commercial bribe receiving, in violation of New York State Penal Law Sections 180.08 and 180.05; and thereafter would and did perform and attempt to perform an act to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of such unlawful activity, all in violation of Title 18, United States Code, Section 1952(a)(3).

### MEANS AND METHODS OF THE CONSPIRACY

16. Among the means and methods by which DOMINICK R. MAIORANO, the defendant, together with CC-1, CC-2, CC-3, and others known and unknown, would and did carry out the conspiracy were the following:

7

      a.   CC-1 and CC-2 offered to pay secret bribes to securities brokers and traders, and paid secret bribes to MAIORANO and CC-3 on approximately four separate occasions.

      b.   MAIORANO recruited one and more other individuals through CC-4 to generate purchases of Biofarm shares in exchange for secret bribes.

      c.   MAIORANO and CC-3 received secret bribes in the form of shares of Biofarm stock from CC-1.

      d.   MAIORANO arranged for secret bribes to be paid to one and more individuals who agreed, through CC-4, to generate purchases of Biofarm shares.

      e.   MAIORANO and his co-conspirators manipulated artificially the demand and price of Biofarm common stock.

      f.   MAIORANO and his co-conspirators used facilities of interstate commerce including the OTC Bulletin Board, in furtherance of the objects of the conspiracy.

### OVERT ACTS

14.   In furtherance of said conspiracy and to effect the objects thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

      a.   In or about the Summer of 2003, DOMINICK R. MAIORANO, the defendant, met with CC-2 in New York, New York.

      b.   On or about August 12, 2003, CC-1 instructed a brokerage firm to transfer 20,000 shares of Biofarm common

stock from one of the CC-1 Accounts ("CC-1 Account No. 1") to the CC-3 Account.

   c. On or about September 3, 2003, CC-1 instructed a brokerage firm to transfer approximately 20,000 shares of Biofarm common stock from CC-1 Account No. 1 to the CC-3 Account.

   d. On or about November 6, 2003, CC-1 instructed a brokerage firm to transfer approximately 10,000 shares of Biofarm common stock from an account controlled by CC-1 ("CC-1 Account No. 2") to the CC-3 Account.

   e. On or about November 17, 2003, CC-1 instructed a brokerage firm to transfer approximately 5,000 shares of Biofarm common stock from CC-1 Account No. 2 to the CC-3 Account.

   (Title 18, United States Code, Section 371).

## FORFEITURE ALLEGATION

  15. As a result of committing one or more of the securities fraud offenses alleged in Count One of this Information, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Sections 371 and 2, DOMINICK R. MAIORANO, the defendant, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any

and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to at least $27,060.25 in United States currency, representing the proceeds obtained as a result of the charged securities fraud offenses alleged in this Information.

<u>Substitute Asset Provision</u>

16.  If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    a.   cannot be located upon the exercise of due diligence;

    b.   has been transferred or sold to, or deposited with, a third person;

    c.   has been placed beyond the jurisdiction of the Court;

    d.   has been substantially diminished in value; or

    e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 982(b) and Title 21, United States

Code, Section 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property described above.

   (Title 18, United States Code, Sections 981(a)(1)(C) and 982,
        Title 21, United States Code, Section 853,
     and Title 28, United States Code, Section 2461).

                                    */s/ Michael J. Garcia*
                                    MICHAEL J. GARCIA
                                    United States Attorney

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

DOMINICK R. MAIORANO,

Defendant.

### INFORMATION

07 Cr.

18 U.S.C. § 371

MICHAEL J. GARCIA
United States Attorney.